172 N.J. Super. 489 (1980)
412 A.2d 1064
RICHARD WOODSUM AND JUDITH WOODSUM, HIS WIFE, PLAINTIFFS,
v.
TOWNSHIP OF PEMBERTON, A MUNICIPAL CORPORATION OF THE STATE OF N.J., MUNICIPAL UTILITIES AUTHORITY OF THE TOWNSHIP OF PEMBERTON; HAROLD C. GRIFFIN, MAYOR, TOWNSHIP OF PEMBERTON, FRED DETRICK, HAROLD GRIFFIN, CHARLES JONES, ELMER D'IMPERIO AND ANTHONY ZOPPINA, AS MEMBERS OF THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PEMBERTON AND INDIVIDUALLY, AND R. LEWIS GALLAGHER AND LAYNE-NEW YORK CO. INC., DEFENDANTS.
Superior Court of New Jersey, Law Division  Burlington County.
Decided January 29, 1980.
*494 Richard M. Sevrin for plaintiffs (Gertner & Sevrin, attorneys).
Frederick W. Hardt for defendant R. Lewis Gallagher (Sever, Hardt & Main, attorneys).
Donald E. Williams, for defendant Township of Pemberton (Polino & Williams, attorneys).
HAINES, J.S.C.
Plaintiffs' residence, purchased in 1968 and situate in Pemberton Township, Burlington County, New Jersey, was supplied with water for domestic use by a well extending into the Wenona-Mt. Laurel aquifer. In 1972 defendant township constructed a water plant and two wells, drawing from the same aquifer, to provide water for public consumption. Required approvals were obtained from state agencies. Bonds were issued in the amount of $1,370,000 to finance the project. It was estimated that the new plant would extract 18,800,000 gallons of water a month. It is the plaintiffs' contention, taken as true for *495 present purposes, that the operation of the new plant lowered the water table reached by their well to the point where they were deprived completely of any water supply. As a result they were obliged to vacate the house and to rent other quarters. The dwelling has been vacant ever since and, despite efforts by plaintiffs, has been vandalized and substantially damaged. Plaintiffs' water supply could have been restored by deepening their well at a cost of $750 to $1,700 (depending on whether a "packer" could be removed without damage). They had no funds for that purpose and were unable to borrow; consequently, the work was never performed. They claim damages from the township, the individual members of its governing body, its municipal utilities authority, the members of that authority, and its engineer. (Suit against defendant Layne-New York was previously dismissed.)
The basic issue in this controversy concerns the respective rights of the parties in the subterranean waters used by both of them. The law concerning such rights, at least in a contest between overlying owners and a merchandiser of water, as here, was last established by Meeker v. East Orange, 77 N.J.L. 623 (E. & A. 1909). Significant changes in scientific knowledge, demand for water and legislation have occurred in the 70 years since Meeker was decided. Hanks, "The Law of Water in New Jersey: Ground Water," 24 Rutg.L.Rev. 621, 649 (1970); Restatement, Torts 2d, c. 41 at 255 (1979). Nevertheless, no court has had an opportunity to interpret Meeker in the light of those events, until now.
Plaintiffs' claims for damages are based upon two theories: (1) the township's interference with their water supply was a "taking" of their property without due process, contrary to U.S.Const., Amend. V and N.J.Const., Art. 1, par. 20, permitting recovery in a direct constitutional action, and under the Federal Civil Rights Act, 42 U.S.C.A. § 1983, and (2) the actions of defendants were negligent in their construction of the new water plant and in their breach of a duty to correct plaintiffs' *496 water problem once it became known. Consequential and punitive damages are sought. The complexity of these issues invited a pretrial conference at which defendant was ordered to move for summary judgment. That motion was made, considered and denied. As trial approached, additional information was received. The court reopened the summary judgment proceedings, required and received additional briefs, heard further oral argument and, in this opinion, readdresses the issues which are subject to resolution by summary judgment pursuant to R. 4:46. The facts were stipulated for the purpose of the motion.

I. Water Rights; the Background
The issues here concern ground water as opposed to diffused surface water and surface stream water. Ground water consists of underground streams and percolating waters. It is the presumption in New Jersey, as in most states, that underground water is percolating water and not a stream. Ocean Grove Camp Meeting Ass'n v. Asbury Park, 40 N.J.E. 447 (1885); Hanks, supra at 626. No party here argues for the existence of an underground stream; all refer to an aquifer as the source of supply of plaintiffs' and the township's wells. In this opinion, all references to ground water are intended to mean percolating water.
Changes in our understanding of the nature of water and its movements through the earth are illustrated by the following quotations, 113 years apart, noted in Hanks, supra:
Water, whether moving or motionless in the earth, is not, in the eye of the law, distinct from the earth. The laws of its existence and progress, while there, are not uniform, and cannot be known or regulated. It rises to great heights, and moves collaterally, by influences beyond our apprehension. These influences are so secret, changeable and uncontrollable, we cannot subject them to the regulations of law, nor build upon them a system of rules, as has been done with streams upon the surface. Roath v. Driscoll, 20 Conn. 532, 540 (1850).
Water gets into the ground wherever and whenever it is available in excess of the field capacity of the soil and can move downward by gravity through the *497 zone of aeration to the water table, or wherever and whenever water in a surface body has a higher head than the adjacent ground water; [it] moves through the rocks around, over, under and through obstacles formed by zones of lower permeability; it approaches the land surface or a body of surface water where the head is lower; and it is discharged by seepage or spring flow into streams, lakes or the ocean or is dissipated by water-loving plants or by evaporation from the soil. As a phase of the hydrolytic cycle the ground water reservoir serves as nature's great delaying and storage medium for water. In it water is relatively safe from evaporation and contamination. It furnishes large supplies of water and can furnish more. And, of great importance to the comprehensive multiple-purpose developments of the future, its storage and water-transmitting properties in many places offer a means for integrated management of ground and surface water. That is, floodwaters can be stored underground while they are available, and water supplies can be sustained by natural or artificially assisted ground water discharge in dry weather. The Role of Ground Water in the National Water Situation, U.S. Geological Survey, Water Supply Paper 1800 (1963), reprinted in part in Sax, Water Law: Cases and Commentary, 243-44 (1965); see also, Rest., Torts 2d, Ch. 41, at 254. [at 624-625]
We are dealing here with the use of an aquifer, defined as follows:
The term `aquifer' describes a body of rock (as used in this report, `rock' includes unconsolidated material such as sand, gravel, clay and soil) that is filled with water and is permeable enough to carry or yield water in useful quantities. The term `ground water reservoir' may be used interchangeably with `aquifer'. Or, the term `ground water reservoir' may be broadened to include all the rocks beneath a given area from the top of the zone of saturation to its bottom at an indefinite but great depth where openings in the rocks cease to exist. According to the latter usage, all the rocks in the zone of saturation are a part of `the ground water reservoir'  aquifers and confining beds (aquicludes), and both fresh and salty water. ["The Role of Ground Water in the National Water Situation," as reprinted in Sax, supra, at 242, n. 7, quoted in Hanks, supra at 629]
New Jersey's water situation is as follows:
New Jersey, like many Eastern states, has an abundance of water resources, which if properly protected and developed should be sufficient to supply all *498 foreseeable needs. The source of its good fortune is an average annual precipitation of 45.5 inches. Approximately half of this precipitation goes to evaporation and transpiration (use by plant life), with evaporation losses being relatively minor except for large lakes and reservoirs. The balance infiltrates into the ground or becomes surface runoff, forming streams and ultimately reaching the sea. These two  ground water and surface runoff  are the basic sources of water supply. [Footnote omitted.]
The distribution of precipitation between infiltration and surface runoff varies greatly in New Jersey due primarily to its complex geological structure and secondarily to pronounced differences in urbanization within the state, with urbanization tending to increase the proportion going to surface runoff. The state is divided into five ground water provinces: the Appalachian Valley, the Highlands, the Piedmont Plain, the Inner Coastal Plain and the Outer Coastal Plain.
The Appalachian Valley Province's geology is such that there is a great range in the dependable yield of ground water. Wells in those areas underlaid by limestone may yield over 50 gallons per minute but those areas underlaid by slate often yield less than 20 gallons per minute.
The Highland Province is underlaid for the most part by limestone. It provides wells with a dependable ground water yield of 20 to 50 gallons per minute. Neither the Appalachian nor Highlands provinces produce a ground water supply which could support industrial or heavy residential development.
The Piedmont Plain offers greater potentiality for ground water supplies than either the Appalachian Valley or Highlands provinces. It is underlaid for the most part by sandstone, shale, and traprock. Most of the wells in this province will yield from 100 to 150 gallons per minute. Also, local occurances [sic] of material from glacial origin yield fairly large quantities of water for municipal supplies in this Province. These materials fill ancient river valleys generally adjacent to or under present rivers. In the Piedmont Plain Province, which includes the heavily populated northeast, the local ground water sources are substantially developed ...
The Inner Coastal Plain is underlaid by unconsolidated sands, clays and greensand marls. Wells in this Province yield approximately 200 gallons per minute but some yield as high as 500 gallons per minute. This Province is highly developed for industrial and residential uses in many portions and extensive future development is expected.
The last Province, the Outer Coastal Plain, contains the greatest ground water potential. It is underlaid by unconsolidated sands, clays and gravels. Wells are able to yield 500 gallons of water per minute. Most of southern New Jersey's *499 population and industry depend upon ground water from the Inner and Outer Coastal Plain Provinces and these sources are able to provide much more than this half of the state is able to use. The Outer Coastal Plain Province contains one of the most abundant ground water sources in the world. Because its estimated potential supply is at least one billion gallons per day, it could supply water to ease the northeastern [New Jersey] problem, if the necessity arose.
The highly urbanized Northeastern section of New Jersey unfortunately does not coincide with the vast ground water basins in the Inner and Outer Coastal Plains. As a result North Jersey depends primarily on surface water supplies while South Jersey relies primarily on the ground water supplies. Of the 696.6 million gallons per day (mgd) used by the state's population from public supplies in 1961, 455.1 mgd were from surface sources and only 241.5 mgd were from ground water sources. Nonetheless, ground water is likely to become as important as surface supplies in the years ahead. For some time the increase in ground water usage has been exceeding the increase in surface source usage on a percentage basis and has been about equal to it on an absolute basis. Increased urbanization in Central and South Jersey will draw heavily on ground water supplies; and further urbanization in North Jersey may require that it look to the ground water riches of South Jersey to supplement its surface supply. [Footnote omitted; N.J. Dept. of Conservation & Economic Development, "New Jersey's Water Resources" (undated but apparently 1964), at 32 33; quoted in Hanks, supra at 622]

II. The Law to Date  In General
Different doctrines governing the use of ground water have been established at different times and in different places. They must be described in order to provide a proper perspective and to determine the extent of their application in the present case.

A. The English Rule

The common law rule, established in England in 1843 by the Court of Exchequer in Acton v. Blundell, 12 M. & W. 324, 152 Eng.Rep. 1223 (1843), as set forth in Meeker v. East Orange, supra, was as follows:
A landowner has no such right or interest in a subterranean water course as to enable him to maintain an action against a landowner who, in carrying on *500 mining operations upon his own land in the usual manner, drains away the water from the land of the first-mentioned owner and lays his well dry. This decision may well have been based upon the doctrine of reasonable use; but it was rested upon the absolute ownership, on the part of the mine owner of all that lay beneath the surface of his land. [77 N.J.L. at 629]
See discussions, Powell, Real Property, § 725 at 417 (1979); 56 Am.Jur., Waters, § 114; Hanks, supra at 631.
It was this rule of absolute ownership that prompted the Connecticut court in Roath v. Driscoll, supra (20 Conn. 532), to say that "water whether moving or motionless in the earth, is not, in the eye of the law, distinct from the earth." Under this concept an overlying owner may extract as much of the subjacent water as he wishes, for any purpose he wishes, notwithstanding the effect on other owners who thus may be deprived entirely of their expected supply of percolating waters. The present case illustrates the difficulties of this harsh rule. If it were applied here, plaintiffs would have the absolute right to withdraw all of the water passing through or lying within their land, regardless of depth, while, at the same time, the Township of Pemberton would have an equivalent absolute right to withdraw all of the waters below the surface of its lands notwithstanding its effect upon plaintiffs. In the final analysis, the overlying owner with the biggest pump and deepest well would control the water otherwise available to both. Further, neither owner could ever be sure that the supply of water would remain available; any other landowner, having access to the same aquifer, could install a still bigger pump and use the entire supply of available water.
American courts, recognizing the problems inherent in the common law, devised modifications and substitutions. The two rules of principal concern here are known as the American Rule and the Rule of Correlative Rights. Meeker involves both.

*501 B. The American Rule

The Court of Errors and Appeals, in Meeker, announced its adoption of the doctrine of "reasonable user." It defined that doctrine only by indirection, saying:
This does not prevent the proper user by any landowner of the percolating waters subjacent to his soil and agriculture, manufacturing, irrigation, or otherwise; nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with or diverted; but it does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it result therefrom that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of subsurface water upon his land, or if his wells, springs, or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage, or other legitimate uses. [77 N.J.L. at 638]
This rule has been called the American Rule of reasonable user. It is set forth succinctly in Annotation, 29 A.L.R.2d, "Subterranean Waters," at 1362, in this language:
In order to confer immunity from liability for the obstruction or diversion, the causative activity or conduct must be a reasonable exercise of a proprietary right.
See discussion, Powell, supra at 422; 56 Am.Jur., Waters, § 114; Hanks, supra at 633.
Under the American Rule it seems clear that malicious or wasteful use is not reasonable, while the extraction of ground water for use in connection with the enjoyment of one's own property is reasonable notwithstanding injury to a neighboring landowner. 6 Powell, Real Property, at 422. However, when the overlying owner uses the water for some purpose that takes it beyond the boundaries of his property, such use, under the American Rule, is unreasonable. Such transporting or merchandising was prohibited in Meeker, and that has been the standard interpretation of the American Rule. Hanks, supra at 636; 6 *502 Powell, supra at 422. Note that there is no objection to the transportation or merchandising of water, however, when there has been no injury to the neighboring owner. Seemingly, this would be a reasonable use.
While Meeker is cited frequently as adopting the American Rule in New Jersey, that conclusion is not necessarily correct. The opinion may well support a theory of correlative rights.

C. The Correlative Rights Rule

Difficulties have arisen in connection with the law of water rights by reason of the common law concept that water and land are essentially one and that proprietary rights in land and water should be the same. This approach ignores an important reality. Ground water does not stand still. It flows or trickles or runs or oozes through the land from one place to another. Its sources are many: rain, surface streams, surface runoff and percolation, to name some. Consequently, a gallon of water extracted from a particular acre of land at one moment probably could not have been so extracted at any other moment. Thus, ownership of subterranean water is transient; water cannot be occupied, seized or used in the same manner as land. For these reasons, it is reasonable and practical to apply rules to the use of water which are different from rules applied to the use of real property.
This difference is recognized by the Correlative Rights Rule under which it is held that there is no proprietary interest in ground water  only a usufructuary interest. As a consequence of this approach, the rule requires a sharing of water, the proportions to be determined by considering both the use of water and the rights of all landowners. As in the case of the American Rule, the test is reasonable use, but in a broader context with a different objective. If offers protection to all users, while giving a priority to all overlying users when they are competing with transporters. In times of water shortage, *503 overlying owners must share the water, and all transporters extracting water from the same source must also share among themselves. However, an overlying owner is not required to share water with a transporter in times of shortage, at least when the overlyer is first in time of use, which is the instant case. In the final analysis, this rule requires "that water be put to reasonable beneficial use. What is a reasonable beneficial use is determined in light of all the circumstances, absent statutory definition, and contains a large dose of reasonableness criteria." Hanks, supra at 644, n. 96; Restatement, Torts 2d, c. 41 at 257; 56 Am.Jur., Waters, § 114.
The American Rule and the Correlative Rights Rule have been used interchangeably. 56 Am.Jur., Waters, supra; Hanks, supra at 631; 29 A.L.R.2d, supra at 1361 and 1364 1365 (where Meeker is cited for both rules). As noted above, however, the rules are not the same. Their differences are explored with some care in Hanks, supra at 639. Meeker adopted the doctrine of "reasonable user," at 638, and is thereby said to have adopted the American Rule. However, the Correlative Rights Rule also demands reasonable use so that Meeker used language applicable to both rules. The appellant in Meeker argued that
... the law recognizes correlative rights in percolating subterranean waters; that each landowner is entitled to use such waters only in a reasonable manner and to a reasonable extent beneficial to his own land, and without undue interference with the rights of other landowners to the like use and enjoyment of waters percolating beneath their lands, or of water courses fed therefrom. [at 626]
The Meeker court referred to the "well-considered" case of Bassett v. Salisbury, 43 N.H. 569 (Sup.Ct. 1862), which challenged the English Rule and held that
... the true rule is that the rights of each owner being similar, and their enjoyment dependent upon the action of other landowners, their rights must be correlative and subject to the operation of the maxim sic utera, &c, so that each *504 landowner is restricted to a reasonable exercise of his own rights and a reasonable use of his own property in view of the similar rights of others. [77 N.J.L. at 626]
Again, the court said:
... it is entirely clear that the strong trend of more recent decisions in this country is in the direction of a repudiation of the English rule and the adoption of the doctrine that there are correlative rights in percolating underground water; that no landowner has the absolute right to withdraw these from the soil to the detriment of other owners, and is limited to reasonable uses. [at 632]
The same court decided P. Ballantine & Sons v. Public Service Corp., 86 N.J.L. 331 (E. & A. 1914), five years after Meeker. Its opinion referred to Meeker, on the basis of which it said that
... it is the settled law of this state that the landowner has not an absolute and unqualified property in all water found percolating in his soil to do what he pleases with it ... He has the right to its use only in a reasonable manner and to a reasonable extent, for his own benefit for domestic purposes as well as in manufacturing, and his own consumption as in agriculture, irrigation and the like, and without undue interference with the rights of other landowners to the like use and enjoyment of such water. [at 333]
The language of Meeker and of Ballantine is the language of the Correlative Rights Rule. It is the "better guess" of Hanks, supra at 659, that New Jersey is a Correlative Rights state as opposed to an American Rule state.

D. The Prior Appropriation Rule

"Prior Appropriation" is a doctrine under which the person first taking water from the ground has a right superior to a later taker and receives priority treatment in times of shortage. Hanks, supra at 648. It is not a rule to be considered in this *505 case and is mentioned only to round out the various theories of water law applied in ground water cases.

E. The Restatement Rule

The Restatement, Torts 2d, § 858, provides:
(1) A proprietor of land or his grantee who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water by another, unless
(a) the withdrawal of ground water unreasonably causes harm to a proprietor of neighboring land through lowering the water table or reducing artesian pressure,
(b) the withdrawal of ground water exceeds the proprietor's reasonable share of the annual supply or total store of ground water, or
(c) the withdrawal of the ground water has a direct and substantial effect upon a watercourse or lake and unreasonably causes harm to a person entitled to the use of its water.
[Additional sections of the Restatement are referred to for determination of liability]
This suggested rule is close to the Correlative Rights Rule. However, it eliminates the emphasis upon rights relating to the overlying land, seems to ignore differences between transporters and overlying owners, and relies entirely upon tests of reasonableness and beneficial purpose when fixing liability. The rule is discussed and criticized by Lowe, Ruedisili and Graham, "Beyond Section 858: A Proposed Ground Water Liability Management System for the Eastern United States," 8 Ecology Law Q., 131 (U. of Cal. 1979). It is not applied here since the rule of stare decisis binds this court to Meeker.

III. Changing Law in New Jersey
The uses to which ground water is put in New Jersey and the anticipated future reliance on that source of supply have been noted at the beginning of this opinion. Concern for the protection *506 of this resource has been expressed by the Legislature in its enactment of several statutes, all of which became effective after Meeker. N.J.S.A. 58:4A sets forth conservation measures for subsurface and percolating waters. It authorizes the Division of Water Policy and Supply to designate areas where diversion of such waters "threatens to exceed, or otherwise threatens or impairs, the natural replenishment of such waters," and requires permits for such diversion in excess of 100,000 gallons a day. It refers to the conservation of natural resources "for public use." Well drillers are required to be examined and licensed. Penalties are provided. The law was first adopted in 1947 and was amended in 1968, 1971 and 1973. N.J.S.A. 58:6 provides for approval by an appropriate state agency of plans for the diversion of water from "any new or additional source or sources of water supply in this state" by any municipal or other corporation engaged in the business of supplying water for public use. The same law authorizes such corporations to
... acquire by gift, devise, purchase or condemnation all such lands, water and water rights as may be required to enable such municipal or other corporation, or such person or persons, to divert and use water for such new or additional water supply or from such new or additional source or sources of supply in accordance with the plan so approved and the assent of the state so obtained.
In 1977 the Water Pollution Control Act, N.J.S.A. 58:10A, was adopted. The same year saw passage of the Water Quality Planning Act, N.J.S.A. 58:11A, and the State Drinking Water Act, N.J.S.A. 58:12A. In 1979 the Legislature adopted the Pinelands Protective Act, N.J.S.A. 13:18A, which, among other things, expresses concern over the "environmental degradation of surface and ground waters" in the event of inappropriate development of the pinelands in southern New Jersey, and establishes a commission to prepare plans which will protect such water. The Legislature, therefore, has given recognition to the considerable stake which the public has in ground water resources, a circumstance which must be taken into consideration *507 when deciding whether particular governmental action is a "taking" of property requiring compensation.

IV. Developing Concerns
Developing concerns about water, caused by changing societal problems and needs affect application of the American and Correlative Rights Rules. The historical perspective is provided in 5 Powell, Real Property:
The rules applicable to percolating and to surface waters developed along different lines in both England and the United States. The law of percolating waters began in an atmosphere of substantially unrestricted privilege but, with increasing judicial sensitivity to social necessities, has moved toward either reasonable use or some statutory system of appropriation called for by the special circumstances existing in arid and semiarid states. The law of surface waters began in the diametrically opposed theories of natural flow and "common enemy", but each of these theories has had its edges smoothed away. The result, under both approaches, has a substantial reasonable use aspect, and an occasional state has recognized the completion of this transitional process in its decisions. All of this means that the subject matter of this whole chapter has been in a state of important change during the past fifty years and that this state of flux is, by no means, ended in many states. This requires, in the reaching of a decision, constant attention to the stage in the evolutionary process which has been attained by the time of that decision's writing, and to the exact sense in which the judge is using convenient doctrinal or conceptual terms. The trend, through recent decades, in stream law, as well as with regard to subterranean and surface waters, has been toward a set of rules which will assure the best social utilization of these gifts of nature consistent with a reasonable protection of private land ownership. The Restatement of the Law of Torts has given full recognition to this trend by assimilating all of these widely different problems into the single one of weighing the "utility of the use" against the "gravity of the harm". This simplicity can be regarded as an ideal towards which our decisions are moving, but which we have not yet fully attained in most jurisdictions. Furthermore, the simplicity of the conceptual statement must never be permitted to obscure the continuing differences of circumstances which require weighing, in these factually divergent fields of human activity. [at 416-17]
........

*508 It is to be hoped that the social concern in the wise utilization of the natural resource of subterranean waters will find full recognition in future statutes and in future decisions dealing with the problems of conservation either through a more detailed exposition of the social implicits in property ownership, or by the operation of the police power of the states. [at 435]
A recent case stresses the necessity for balancing public and private interests in water:
The observation is made only to point up the fact that attempting to carry out the overriding purpose of our water law, of seeing that all available water is put to beneficial use, and at the same time preserve the rights of individual users to a particular flow of water, presents a problem which is perplexing indeed. Though there is no precise answer, this writer believes that the best approximation of an answer is to be found in recognizing the necessity of analyzing the total situation and the balancing of individual rights in relationship to each other in a reasonable way under the circumstances which will best serve the above stated overall objective.
........
While the problem here under discussion may seem novel, pursued to its fundamentals, it is in essence the same issue that is confronted so frequently in the law: the right of the individual as compared to the rights of the group (the state). Because of our proneness to `identify' with individuals, our first reaction and empathy often leans to the individual. What we sometimes lose sight of is that the rights of the individual could not exist except for the assurance of the group (the state). It is only by the forbearance of individuals in deference to the law, that any peaceable and secure enjoyment of the right to use water is able to exist. Inasmuch as such rights are so assured and protected only by the authority of the state, it is both logical and necessary that the rights of each individual should be to some degree subordinate to and correlated with reasonable conditions and limitations thereon which are established by law for the general good. We believe that reflection will demonstrate that if this principle is applied with wisdom and restraint, in due consideration for the rights of all concerned, it will be seen that the result will better serve the group (all users and society) by putting to beneficial use the greatest amount of available water, and ultimately also for each individual therein, than would any ruthless insistence upon individual rights which simply result in digging deeper and deeper wells. [Wayman v. Murray City Corp., 23 Utah 2d 97, 458 P.2d 861, 864 (Sup.Ct. 1969)]

*509 V. The "Taking" Issue
In deciding whether there has been a taking of property without due process in the instant case, we must start with the rule laid down in Meeker v. East Orange, supra, since that remains the leading and most recent case on the subject. The language of the opinion deserves repetition. After stating that it adopted the doctrine of "reasonable user" the court said:
[It] does not prevent the proper user by any landowner of the percolating waters subjacent to his soil and agriculture, manufacturing, irrigation, or otherwise; nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with or diverted; but it does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it thereby results [therefrom] that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of subsurface water upon his land, or if his wells, springs, or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage, or other legitimate uses. [77 N.J.L. at 638; emphasis supplied]
Emphasis is placed upon the requirements, before an overlying owner may claim wrongful diminution of his underground water supply, that such diminution amount to an interference with his "reasonable user" of such water or "materially diminish" the flow of such water in his land and that the competing use not be a "proper user."
The extraction of water by the Township from the common aquifer to serve the public certainly qualifies as a "proper user"; in the light of society's needs, it is a priority use. In deciding whether plaintiffs' use of their supply of percolating water was reasonable, it is helpful to decide whether the rule of Meeker, which is now the law of New Jersey, is one of Correlative Rights or is the American Rule. It seems quite clear that Meeker is entirely out of date in the sense that it did not address modern water conditions. It cannot be denied that the last 70 *510 years have produced a vast amount of scientific knowledge concerning underground waters not available to the Meeker court. During those years the population of this State has increased many times. This increase, and the accompanying proliferation of residential, commercial, industrial and recreational land uses, materially affect our concerns about water rights and water usage. The need to protect and provide for the public use of water has become very significant. Under the circumstances, it might be well to ignore Meeker and lay down a modern rule which would better serve public and private requirements. I am bound, however, by rules of stare decisis and must follow the rule laid down in Meeker, a decision of our highest court. Stare decisis, however, does not deny the right to interpret that case and to apply its rules in the light of modern conditions. Smith v. Brennan, 31 N.J. 353, 362 (1960).
It is entirely sensible, reasonable and appropriate to conclude that Meeker adopted the rule of Correlative Rights as to percolating waters in New Jersey. That is the language of the decision and, in its language, it is a rule which is "in accordance with sound reason and general principles of law and justice." (77 N.J.L. at 629) Surely, a rule which addresses reality, namely, that rights in underground water are usufructuary not proprietary, is in accordance with sound reason. It is the law of New Jersey with respect to surface streamwaters. In McCarter v. Hudson Cty. Water Co., 70 N.J. Eq. 695 (E. & A. 1906), aff'd 209 U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828 (1908), a case dealing with diversion of water from the Passaic River, the Court of Errors and Appeals said:
But in view of the transient and flowing nature of water, the landowner's property therein is not absolute but qualified. In a sense he owns it while it is upon his land, but his ownership is limited to a usufructuary interest, without right to divert any from its natural course, saving for the limited uses that naturally and of necessity pertain to a riparian owner, such as the supply of his *511 domestic needs, the watering of his cattle, the irrigation of his fields, the supplying of power to his mill, and the like. The right of user is limited to so much as shall be reasonably necessary, and is qualified by the obligation to leave the stream otherwise undiminished in quantity and unimpaired in quality. [at 708]
Justice is served best when there is a sharing of common water sources on a basis that is fair. Meeker did not discuss water rights in terms of proprietary interests or usufructuary interests so that this court is not merely free but is obliged to adopt the appropriate principle of law dealing with those basic property considerations. Meeker did provide rules by which reasonableness is to be measured and those rules apply here.
Under the Correlative Rights Rule, and under Meeker, there can be no recovery by an overlying owner against a transporter unless injury is shown (the same is true of the American Rule). There can be no injury unless the interference with the overlying owner's supply of water is an interference with his reasonable use thereof. In defining what is reasonable, a number of factors must be taken into consideration:
(1) The landowner who provides for his domestic supply of water through a shallow well, possible because of a high subterranean water table, and who constructs that well at a time when no other users affect his water supply, does so with the knowledge that other users may appear who may lower the water table and diminish or eliminate his water supply. He is bound to share his water with such other users on a reasonable basis. Therefore, if his use is to be described as "reasonable," he must dig his well to a depth which anticipates the lowering of the water table by virtue of other "proper users." A subsequent purchaser of the property on which the well is located must take title subject to these continuing requirements. It would make no sense at all to permit a conveyance to defeat the rights of third parties.
*512 (2) Since the right to use underground water is usufructuary, due process concerns are diminished. The right to use water is not an absolute property right.
(3) The right of "reasonable user," established by Meeker, is a right which must be considered in the light of conditions existing at the time a given problem arises. Today New Jersey is a populous urban state with water needs which are much different than they were in 1909. It is now even more necessary that private users of subterranean water acknowledge the public interest in that water source, an interest to which the Legislature has given increasing recognition. A reasonable use of such water is one which accommodates that public need.
In addition to the rule of reasonable use by the complaining owner (as well as his competing user), Meeker denies recovery unless there is a material diminution in his flow of underground water. That diminution is not material unless it is so significant that it interferes with the reasonable use of the overlying owner.
The purpose of any application of the rules of "reasonable user" and "material diminution" is to permit a conclusion as to whether there has been a taking without due process. That conclusion may be reached only if the rules are applied with an appreciation of modern "taking" law, which balances governmental uses of the police power against due process concerns. The necessity for balancing these considerations in the present case is obvious. No government entity can take any water for public consumption without affecting the source of supply of other users. The question is whether such use is reasonable.[1]Washington Market Enterprises v. Trenton, 68 N.J. 107 (1975), illustrates the problem and provides the current New Jersey rule:

*513 The general question as to when governmental action amounts to a taking of property has always presented a vexing and thorny problem. If there has been a taking, both Federal and State Constitutions require the payment of compensation: U.S.Const., Amend. V; N.J.Const., art. I, par. 20. If there has not been a taking, any loss that may have been suffered is damnum absque injuria; there has been a non-compensable governmental exercise of the police power. [at 116]
In that case plaintiff's property had lost value because it was in an area designated as blighted by the City of Trenton. The Supreme Court said (at 122): "We hold that where the threat of condemnation has had such a substantial effect as to destroy the beneficial use that a landowner has made of his property, then there has been a taking of property within the meaning of the constitution". The property owner was required to show "that there had been substantial destruction of the value of its property and that defendant's activities had been a substantial factor in bringing this about". (At 123).
saying (at 203) that "a proper exercise of the
The rule of Washington Market was interpreted in Schnack v. State, 160 N.J. Super. 343 (App.Div. 1978):
In any event, the holding in Washington Market clearly contemplates a reduction in value of a piece of property to `near zero' as a result of the actions of the condemning authority before a landowner is entitled to compensation. [at 350; citations omitted].
See, also, Independence Savings Bank v. 290 Madison Corp., 167 N.J. Super. 473 (App.Div. 1979).
Bayshore Sewerage Co. v. Environmental Protection Dept.,, 122 N.J. Super. 184 (Ch. 1973), aff'd 131 N.J. Super. 37 (App.Div. 1974), involved the construction of a regional sewer plant which would treat sewer from territory otherwise served by plaintiff's facility which was therefore to be abandoned. Plaintiff claimed a taking. The circumstances are similar to those involving the within plaintiffs who lost a supply of water because of the construction of a public water plant. The court denied recovery, saying (at 203) that "a proper exercise of the police power is *514 without the limitations and restrictions of the constitutional provisions applying to the exercise of eminent domain."
In a zoning context, restraints which prevent all practical use of a property constitute a taking. Harrington Glen v. Leonia, 52 N.J. 22 (1968).
In Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the recognized federal authority on the subject, it was held that the regulation of the use of property to such an extent as to destroy the right to its use constitutes a taking which requires compensation. The philosophy of Justice Holmes, who wrote the opinion, prevails today. He said:
Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature, but it is always open to interested parties to contend that the legislature has gone beyond its constitutional power. [at 413, 43 S.Ct. at 159]
A broad discussion of the difference between permissible regulation and impermissible taking may be found in Bosselman, Callies and Banta, The Taking Issue (Sup't of Documents, U.S. Gov't Printing Office, Stock No. 4111 00017 (1973)), an analysis of the constitutional limits of land use control prepared for the Council on Environmental Quality. Generally speaking, this analysis shows: (1) Historically, there was no "taking" by the government unless there was an actual seizure of land. The idea of "taking" by regulation is a 20th Century invention. Until then, it was thought that government could always regulate the use of land as long as regulation was reasonable and in *515 the public interest. [id. at 51]; (2) under the present day rule, when a restriction so affects property that it is rendered economically useless, a taking occurs. [id. at 166, 177]; (3) where there is no significant economic loss and regulation serves an important public interest, there is no taking. [id. at 197]; (4) financial loss is a relevant but not decisive consideration. [id. at 208, 209].
It should be understood that the regulation of property uses by a proper exercise of the police power does not take property; it merely prohibits its use for certain purposes by all persons in the public interest. This is explained in Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887):
A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the state that its use by anyone, for certain forbidden purposes, is prejudicial to the public interests. Nor can legislation of that character come within the Fourteenth Amendment, in any case, unless it is apparent that its real object is not to protect the community, or to promote the general well-being, but, under the guise of police regulation, to deprive the owner of his liberty and property, without due process of law. [at 667-668, 8 S.Ct. at 301]
On the basis of this analysis of constitutional requirements it must be concluded that there is no "taking" unless the loss of property value is very substantial when the complained of use is for an important public purpose.

VI. The Application of the Rules to Plaintiffs
Here, for the purpose of the motion for summary judgment, it is conceded that defendant's use of the aquifer eliminated plaintiff's water supply. That supply could have been restored by deepening their well at a cost of $750 to $1,700 *516 (depending on whether a packer "could be removed without damage"). Had the rights of future users been recognized when the well was constructed, it would have been drilled to a depth which anticipated a lowering of the water table at a probable cost of less than $750. The rights of those future users in the subterranean water cannot be adversely affected by the conveyance of the property on which the well is situate by plaintiffs' grantors and their predecessors. If the contrary were true, future users would have no protection. The burden imposed by the Correlative Rights Rule must run with the land.
The water of which plaintiffs were deprived was used for public consumption. It supplied an absolute need. Clearly, it was a "proper user" under Meeker. Plaintiffs were entitled only to the "reasonable use" of the subterranean water, a use which requires a consideration of reasonable uses by others. Measured by the cost of correcting plaintiffs' problem, the diminution in their water supply was not material and the loss in property value was not substantial. In effect, the construction of the public water system simply forced plaintiffs to deepen their well. That effect is no different, in legal consequence, to regulations requiring properties using septic systems to be connected to a public sewer system; that requirement is a proper exercise of the police power even though the use of the private sewer system is lost and a connection charge incurred. Fenton v. Atlantic City, 90 N.J.L. 403 (Sup.Ct. 1917).
It follows that there was no "taking" of plaintiffs' property.

VII. The Application of the Tort Claims Act
The Township asserts immunity under the Tort Claims Act, N.J.S.A. 59:1 1 et seq. Plaintiffs claim that the act does not apply because the township, in constructing a plant which deprived them of water, created a dangerous condition for which liability is imposed under the provisions of N.J.S.A. 59:4 2. *517 They also argue that such construction was a ministerial act so that normal discretionary immunity concepts do not apply. N.J.S.A. 59:2-3. Finally, it is claimed that the township bodies had an obligation to carefully investigate and promptly correct the condition of which plaintiffs complain as soon as they were made aware of the circumstances. They rely, in part, upon an informal "promise" to do so. It is contended that this obligation or duty was breached by failure to investigate properly and failure to correct the condition, actions which are said to be intentional. The required investigative and corrective actions are said to be ministerial acts so that here also discretionary immunity is not available to the township or its employees.
The purpose of the Tort Claims Act was to establish immunities for municipalities; it was not designed to create liability. N.J.S.A. 59:1 2; N.J.S.A. 59:2 1; Burg v. State, 147 N.J. Super. 316 (App.Div. 1977), certif. den. 75 N.J. 11 (1977). In addition, it preserved common law immunities. The provisions of N.J.S.A. 59:2 1(b) are that, "Any liability of a public entity established by this Act is subject to any immunity of the public entity and is subject to any defenses that would be available to the public entity if it were a private person." A comment to this section of the Act states in part that:
Subsection (b) is intended to insure that any immunity provisions provided in the act or by common law will prevail over the liability provisions. It is anticipated that the Courts will realistically interpret both the statutory and common law immunities in order to effectuate their intended scope.
Consequently, if an immunity was in existence prior to the Tort Claims Act, it remains available to a municipality.
The construction of a water plant to supply water for public consumption involves many discretionary decisions. Among them are the location of the plant, the location of wells, the depth of wells, the number of wells, the number of persons to be served in the future and the capacity of the plant generally. In *518 undertaking this work the township was obliged to act in a legislative and quasi-judicial capacity, notable areas of discretion. Harrington v. Woodbridge, 70 N.J.L. 28 (Sup.Ct. 1903); Barney's Furniture Warehouse v. Newark, 62 N.J. 456 (1973). It has long been clear that where the decision-making process of a government entity is "grounded in governmental judgment and discretion" our courts do not permit "the sanction of an imposition of damages for the result of its exercise." Barney's v. Newark, supra at 469. In Amelchenko v. Freehold, 42 N.J. 541 (1964), the court said:
Moreover, establishment of a general method of handling snowstorms is a matter of planning. The decision adopting a procedure regulating when, where and in what order of priority the equipment and personnel are to be used in dealing with them is legislative or governmental in nature. Such decisions cannot be subject to review in tort suits for damages, for this would take the ultimate decision making authority away from those who are responsible politically for making the decisions. The extent and quality of governmental service to be furnished is a basic governmental policy decision. Public officials must be free to determine these questions without fear of liability either for themselves or for the police entity they represent. It cannot be a tort for government to govern. [at 550; citations omitted]
The lowering of plaintiffs' water table as a result of the construction of the water plant was the result of the discretionary action of the township entities. It cannot be the subject of a tort claim; the municipal bodies are immune under common law principles, continued in force under the provisions of the Tort Claims Act.
In addition, N.J.S.A. 59:4 6 provides:
Neither the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement by the Legislature or [by] the governing body of a public entity or some other body or a public *519 employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.
This "plan or design" immunity clearly applies in the present case. It is stipulated that the township plans were appropriately approved. Necessarily, the water loss was a product of the plan and design of the new plant. For example, had the plans called for the location of the new wells in an area where they would not draw from plaintiffs' aquifer, there would have been no diminution in plaintiffs' water supply. Furthermore, the time of the loss in relation to the time of construction is not relevant. The comment to this section of the act specifically says that "it is intended that the plan or design immunity provided in this section be perpetual." That legislative mandate must be followed by the courts. Ellison v. South Amboy, 162 N.J. Super. 347 (App.Div. 1978).
Other sections of the Tort Claims Act underscore the availability of continued common law immunities and provide additional ones. N.J.S.A. 59:2 3 states:
a. A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;
b. A public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature,
c. A public entity is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel, and, in general, the provision of adequate governmental services;
Paragraphs (a) and (b) reflect the common law immunities of municipalities discussed above. Paragraph (c), as well as the common law, squarely counters the contention of plaintiffs that the township had an obligation to investigate and correct plaintiffs' problem. The municipality had discretion in deciding whether an investigation was required, whether monies should be expended, and whether corrective construction should be provided.
*520 The claim that a promise to investigate and correct was made is not set forth in the pretrial order. It was urged in the course of argument on the motion for summary judgment and is disposed of here for that reason. No contract is alleged. It is understood that the alleged promise was informal, not the result of a resolution or ordinance. Its execution would have required an expenditure of municipal funds. Under these circumstances the claimed promise cannot be enforceable. A public body, such as the township entities here, cannot act informally. Enforceable action must be reflected in a resolution, an ordinance or an equivalent formal undertaking. Woodhull v. Manahan, 85 N.J. Super. 157, 164 (App.Div. 1964). The public interest would not be protected if the rule were otherwise. Under the circumstances the promise upon which plaintiffs rely cannot support an action for damages.
Plaintiffs' claim for punitive damages as to the township entities is barred expressly by the provisions of N.J.S.A. 59:9-2(c).
The members of the township committee and utilities authority named as defendants are public employees whose discretionary activities are immune from suit under N.J.S.A. 59:3-2. This section of the act echoes the language of N.J.S.A. 59:2-3 discussed above; it provides immunity for these officials in the circumstances of this case, except as to the claims of malice or willful misconduct, as to which there is no immunity. N.J.S.A. 59:3 14. The facts here do not support the contention of willful misconduct. These defendants undertook construction of a water plant to serve large numbers of the public. It is inconceivable that their intention in doing so was to injure plaintiffs. The claim of malice cannot apply to the alleged promise to investigate and correct since that promise, if made, is not enforceable.
The remaining defendant is the municipal engineer. It is argued that he is a public employee under the Tort Claims Act. The question has not been decided. It has been held that *521 an employee in a similar position, a municipal attorney, is a public employee, but the opinion gives no reasons. Martin v. Demetrakis, 144 N.J. Super. 216 (App.Div. 1976). If he is, he enjoys the same immunity as the other individual defendants. Under ordinary definitions applied to employer-employee relationships, however, the engineer would be an independent contractor expressly excluded from the protection of the act. N.J.S.A. 59:1-3. Even in that capacity it is clear that he is immune from suit for carrying out a plan and design adopted by the municipality and approved by other government authorities. He is immune because the municipality is immune. Cobb v. Waddington, 154 N.J. Super. 11 (App.Div. 1977). He may not be immune with respect to his own contributions to the plans and the design of the water plant, if he so contributed. Further, he is not immune if he acted maliciously. The facts of his involvement and his employment are not clear. Therefore, the application of the Tort Claims Act to him cannot be determined on the motion for summary judgment.

VIII. The Civil Rights Act
The Civil Rights Act (1871), 42 U.S.C.A. § 1983, provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage of any state or territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunity secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
Plaintiffs' basic claim is that they were denied due process since their property, i.e., their water, was taken without compensation. They sue, by way of alternative theory, under the Civil Rights Act, seeking damages. By doing so, they avoid the impact of the New Jersey Tort Claims Act. Their claims involve federal rights which cannot be denied by the passage of state legislation. Hampton v. Chicago, 484 F.2d 602 (7 Cir.1973), cert. *522 den. 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); T&M Homes v. Mansfield, 162 N.J. Super. 497 (Law Div. 1978). Consequently, the immunities provided by New Jersey legislation do not apply.
Since the decision in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), municipalities are not immune from suit under § 1983. However, actions for taking property without due process, frequently referred to as "inverse condemnation" suits, normally have been premised upon an implied right of action under the Fifth and Fourteenth Amendments or upon Art. I, par. 20 of the New Jersey Constitution (1947). The United States Supreme Court has not considered a § 1983 suit involving a "taking" claim. The effect of Monell on such a claim was noted, however, in the dissenting opinion of Justice Rehnquist in that case. He said 98 S.Ct. at 2051, n. 4: "It has not been generally thought, before today, that § 1983 provided an avenue of relief from unconstitutional takings. Those federal courts which have granted compensation against state and local governments have resorted to an implied right of action under the Fifth and Fourteenth Amendments." The right to maintain such an action has been recognized in 6th Camden v. Evesham Tp., 420 F. Supp. 709 (D.C.N.J. 1976).
Cases decided under § 1983, since Monell, have established immunities for municipalities, their officers and employees. Monell left that issue open. In T&M Homes v. Mansfield, supra, I decided that public officials were absolutely immune from suit under the Civil Rights Act, at least as to claims for compensatory damages, while municipalities were qualifiedly immune. I see no reason to change that opinion here.
The rules of qualified immunity are set forth in Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and in Endress v. Brookdale, 144 N.J. Super. 109 (App.Div. 1976). The latter court said:

*523 There should have been a consideration of the objective and subjective criteria of good faith mandated by Wood v. Strickland; that is, the subjective aspect of whether the official acted sincerely and with a belief that he was doing right, and not with a malicious intention to cause a deprivation of constitutional rights; and, if that test was met, the objective standard of whether the official knew or reasonably should have known that his act would violate the clearly established constitutional rights of plaintiff. [at 136-137]
Here, there is no constitutional claim against defendant engineer; he is not accused of taking property, so that the claim under the Civil Rights Act does not affect him. The other individual defendants, being public officials, are absolutely immune under the holding of T&M Homes. I have determined that they did not act maliciously and therefore cannot be assessed for punitive damages. Only the municipality and the utilities authority remain as possible parties. In order to establish their liability under the qualified immunity test, plaintiffs must show that the plan, design and construction of the water plant were undertaken with the malicious intention to deprive them of their constitutional rights or must establish that the municipal entities knew or reasonably should have known that their act in constructing the water plant would violate clearly established constitutional rights of plaintiffs. It is inconceivable, even by the wildest stretch of imagination, that the plant would have been built with the intention of harming plaintiffs. It was built to serve a public need. Plaintiffs' wells were nearly a mile away from the new wells constructed by the township. Plaintiffs' right to have the water table below their land maintained at the level existing before the township wells were constructed was, by no means a clearly established constitutional property right and, as I have held in this opinion, they in fact enjoyed no such rights. Thus, these defendants cannot be charged with knowledge that their project involved the deprivation of constitutional rights. Plaintiffs are unable to overcome the defense of qualified immunity enjoyed by the township entities.

*524 IX. Damages
Damage problems face plaintiffs. I have decided that their property was not taken when the township's use of water in the common aquifer lowered the water table. Consequently, there can be no damages recoverable. If we assume, however, that my conclusions in that respect are wrong, plaintiffs' damage claims are severely limited. Consequential damages are not considered to be a part of "just compensation" in a taking case.
In the usual condemnation case, where statutory procedures relating to eminent domain are followed, the owner whose property is taken in part is entitled to the fair market value of the property taken plus the amount by which the fair market value of the remainder is diminished. State v. Cooper, 136 N.J. Super. 560, 567 (App.Div. 1975). When statutory procedures are not followed and the condemnation is "inverse," the rule should be no different. A definition of inverse condemnation is provided by Matter of Jersey Central Power & Light Co., 166 N.J. Super. 540 (App.Div. 1979):
Inverse condemnation is a remedy designed to protect a landowner whose property has been taken de facto by insuring that he be paid reasonable compensation therefor. Hence, an appropriation of property by a governmental entity or private corporation having power of eminent domain without its having undertaken to condemn or pay compensation to the landowner for the taking, can be redressed by the owner's action in the nature of mandamus to compel institution of condemnation proceedings. Condemnation proceedings are normally initiated by the condemning authority; inverse condemnation proceedings are initiated by the landowner  hence the "inverse" label. [at 544; citations omitted]
In Washington Market Enterprises v. Trenton, supra, the plaintiff claimed the virtual destruction of the value of a business property by a declaration of blight and sued on a theory of inverse condemnation. The court defined damages, on proof of the claimed destruction, as the diminution in the value of the property. Business losses and other consequential damages *525 were neither discussed nor allowed. However, in State v. Gallant, 42 N.J. 583 (1964), a statutory condemnation case, the court set forth the usual rules for the assessment of damages and said (at 587) that the concept "ordinarily excludes compensation for other damages incidental to the taking, such as loss to or destruction of good will, expense of moving to a new location, profits lost because of business interruption, or inability to locate". (The court laid down a special rule (at 590) with respect to industrial equipment: "Where, therefore, a building and industrial machinery housed therein constitute a functional unit, and the difference between the value of the building with such articles and without them, is substantial, compensation for the taking should reflect that enhanced value". Even this special rule clings to the usual test: the value of the property taken.)
In Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644 (1924), the court said:
The settled rules of law, however, precluded his considering in that determination [of the amount of compensation to be awarded] consequential damages for losses to business or for its destruction ... no recovery therefor can be had now as for a taking of the business. There is no finding as a fact that the government took the business or that what it did was intended as a taking. If the business was destroyed, the destruction was an unintended incident of the taking of the land. There can be no recovery under the Tucker Act if the intention to take is lacking. [at 345, 45 S.Ct. at 294; citations omitted]
In Morris and Essex R.R. Co. v. Newark, 10 N.J. Eq. 352 (Ch. 1855), and Beseman v. Pennsylvania R.R. Co., 50 N.J.L. 235 (Sup.Ct. 1888), it was held that consequential damages to adjacent property holders are not compensable. In Newark v. Cook, 99 N.J. Eq. 527, 537 (Ch. 1926), the court said: "Loss of business profits, good-will, fixtures and costs of removal and the like suffered by tenants, obviously, are not lands or real estate, or rights or interests therein in the legal sense and not within the criterion fixed by the statute." (citations omitted). The court *526 refused to allow compensation. In State v. North Jersey Water Supply Comm'n, 127 N.J. Super. 251 (App.Div. 1974), cert. den. Passaic Valley Water Comm'n v. N.J. ex rel. Dept. of Health, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974), Passaic Valley was forced to abandon an old water plant and to connect to a new system. Damages were sought for the cost of the change. These damages were denied "on the ground that they were speculative and conjectural". (At 267).
Plaintiffs here seek damages for the inconvenience, discomfort and expense caused by their forced move as well as an award for the damage to the dwelling caused by vandalism, all in addition to their "taking" claim. These are consequential damages. They are extremely speculative. They are not recoverable in the usual condemnation case, whether inverse or otherwise, under the State or Federal Constitutions.[2]
The Civil Rights Act should not be interpreted as expanding the damage concept of taking cases. The act was designed, as its language clearly states, to permit recoveries when there has been a deprivation of constitutional rights. When there has been a condemnation through appropriate statutory proceedings or as the result of an inverse condemnation, the recovery does not include consequential damages. The Civil Rights Act is not intended to enhance the award which a litigant would have received had his constitutional rights not been denied. In a zoning case, where a taking was claimed, damages have been so limited. Sixth Camden v. Evesham, supra. Only *527 punitive damages, a permissible recovery under the Civil Rights Act, see O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), could provide additional compensation. However, I have found that punitive damages are not recoverable on the facts of this case.
Plaintiffs' damages, if any, are limited to the depreciation in the value of their property caused by the taking, a figure most likely to be measured by the cost of deepening their well, a cost of not more than $1,700.

X. The Direct Constitutional Suit
As stated, most suits for takings in violation of the Due Process Clause have been direct constitutional actions. The Civil Rights Act has not been involved. In Bivens v. Six Unknown Federal Narcotics Agents, 409 F.2d 718 (2 Cir.1969), rev'd 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court approved a suit based directly upon the Fourth Amendment of the United States Constitution. Prior to Bivens, municipalities were subject to suit directly under the Fourteenth Amendment of the United States Constitution for takings without just compensation. See, Note, "Damage Remedies Against Municipalities for Constitutional Violations," 39 Harv.L.Rev. 922, 950, n. 145 (1976). However, whether plaintiffs sue under the Civil Rights Act or directly under the Constitution is not material. The rules which apply are the same.
It seems likely that the United States Supreme Court, when § 1983 is available for suits against municipalities, may no longer permit direct constitutional suits against them for violations of the federal constitution. Justice Powell, concurring in Monell, supra 98 S.Ct. at 2043, suggests this result. See, also, Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 2908 2909, 57 L.Ed.2d 895 (1978). One Circuit Court has so held: Turpin v. Mailet, 591 F.2d 426 (2 Cir.1979). There is no reason to address that issue here.

*528 Conclusion
Plaintiffs have no cause for action. The water taken by the township was not water to which plaintiffs had any right, a circumstance which bars their suit as to all defendants since there was therefore no taking. Several provisions of the New Jersey Tort Claims Act prevent recovery as to all defendants with the possible exception of the township engineer. Any cause for action under the Civil Rights Act or directly under the State or Federal Constitution, if a taking had occurred, would result, at most, in a damage recovery of not more than $1,700. The motion for summary judgment, hereby reconsidered, is granted and plaintiffs' suit is dismissed. No costs.
NOTES
[1] See Restatement, Torts 2d, c. 41 at 262, for a discussion of "unreasonable harm" under its rule.
[2] Some states have constitutional or statutory provisions which provide for compensation in the case of a "damage or taking."

In Van Dissel v. Jersey Central, 152 N.J. Super. 391, 406 (Law Div. 1977), the court noted the difference, saying that "The provisions of both the New Jersey and the United States Constitutions are `taking' provisions. They are not `taking or damage' provisions. Both Constitutions require a taking as prerequisite to the payment of just compensation. (Citations omitted).