Carl F. PETERS, Plaintiff,

v.

**TOWNSHIP OF HOPEWELL, a Municipal Corporation of the State of New Jersey; James Johnson, Jeffrey Wittkop, Samuel Little, Richard Smith, and Walter Reikowski, Defendants.**

Civ. A. No. 78–3108.

United States District Court,
D. New Jersey.

March 19, 1982.

Carl F. Peters, pro se.

Charles F. Harris, Rhoads, Parkin & Harris, Lawrenceville, N. J., for defendants.

## OPINION

DEBEVOISE, District Judge.

### I. *Nature of the Proceedings*

Plaintiff in this action is Carl F. Peters, a resident of the Township of Hopewell, New Jersey. Defendants are the Township of Hopewell, a municipal corporation; James Johnson, Jeffrey Wittkop, Samuel Little and Richard Smith, who were retained by Township authorities to remove certain property from Peters' premises in December, 1972; and Walter Reikowski who, in December, 1972 was Building Inspector and Zoning Officer of the Township.

Peters filed his complaint on December 22, 1978, charging that on December 27, 1972 defendants wrongfully seized personal property belonging to him and damaged his real estate, thus depriving him of property without due process of law in violation of the Fourteenth Amendment of the United States Constitution. Suit is brought pursuant to 42 U.S.C. § 1983.[1]

Peters was represented by counsel until February 9, 1981, at which time I entered an order permitting his attorneys to withdraw. The case was then awaiting trial. In September, 1981 I granted Peters' request for adjournment to enable him to obtain new attorneys, advising him that it would be the last adjournment. He was unable to retain an attorney, and over his objections I required that he proceed to trial on January 12, 1982. The facts were

---

1. The pretrial order was filed on November 5, 1979. On November 27, 1979 defendants moved for summary judgment on the grounds that (i) the order of the Township's Board of Health upon the basis of which Peters' property was seized was entered after a hearing and was not appealed and therefore was *res judicata,* (ii) the hearing before the Board of Health was quasi-judicial in nature and consequently defendants were entitled to the defense of immunity, and (iii) the Township cannot be held liable on a theory of respondeat superior.

In an opinion read from the bench I granted the motion with respect to Count II of the complaint, which sought to hold the Township liable on a respondeat superior theory. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). I denied the motion with respect to Count I of the complaint for the reason that Peters' complaint does not attack the validity of the order of the Board of Health; it attacks the allegedly unlawful action taken to implement that order. Therefore, the defenses of *res judicata* and judicial immunity (even if applicable to proceedings of the Board of Health) are not pertinent in this case. An order implementing this opinion was entered on February 21, 1980.

presented exhaustively. At the conclusion of the evidence I reserved decision.

### Findings of Fact

This is a sad case. Peters is a man who marches to a different drummer, whose visions are not shared by others. His actions, taken pursuant to firmly held convictions of his rights, flouted reasonably held expectations and rights of his neighbors and violated lawful regulations of the community in which he lives. The irreconcilable nature of these differences led to the episode which is the subject of this case.

Peters, a machine designer having a BA in mechanical engineering, is an old car enthusiast. He values highly old equipment and devices of all sorts, despising recent machinery. He collects and seeks to preserve those things which he considers worthwhile in order to show it is possible to build things well and to put to use these older articles.

In 1958 Peters and his family moved into the residence in Hopewell Township which he and his wife still occupy. He brought with him five old automobiles, a part of his collection. His house is located on a lot measuring 100 feet by 150 feet, situated in a modest but attractive residential neighborhood of generally well-tended homes and yards.

As the years went by, Peters accumulated more old automobiles, which numbered 11 in December, 1972. Some were operative; some were not. Peters was continuously in the process of repairing and restoring these vehicles. At any one time some of them were in an advanced state of repair and others were dismantled and in a state of considerable disrepair. To plaintiff they were antique automobiles having great value. To his neighbors they were junk which gave Peters' property the appearance of an automobile graveyard. In fact, were each treated separately it would be an object of greater or lesser value capable of renovation and sought after by persons interested in old models of automobiles. In the aggregate they were offensive and illegally stored.

In addition to automobiles Peters assembled on his lot an extraordinary collection of other older objects which he intended to repair and put to good use—wire, wheels, bicycles, lawn mowers, parts, tools, lumber, trailer hitches, and the like. There were two woodpiles, a west compost pile, an east compost pile, and a stone pile.

In an attempt to placate his neighbors and/or to provide shelter for his assemblage of objects Peters erected a number of structures on his lot. He built what he called "garages" around many of the automobiles—made of upright poles or concrete blocks and covered with blue or black plastic cloth. He collected a large number of Christmas trees and erected them along one boundary to shield his property from his neighbors' eyes. Regrettably the trees turned brown and the so-called "garages" appeared to the neighbors as unsightly as the objects they were intended to conceal. Peters erected high and low walls made of concrete blocks. In addition, there were a trellis, two fireproof sheds, other sheds, a plant stand, a cat house and a garden house.

Peters' neighbors complained to Township authorities about the condition of his premises, and Township authorities inspected the premises from time to time. In August of 1972 an inspection was made by Fred DeFrank, the Township Health Officer, defendant Walter R. Reikowski, the Township Building Inspector and Zoning Officer, and Doris Tomlinson, the Township Director of Welfare and Public Health Nurse. A report prepared by Mrs. Tomlinson reflected that they found nine unregistered cars "apparently not in running condition" and litter consisting of "door panels, bicycle parts, auto parts, logs and brush, metal parts, flower pots, etc.". The report also noted "[s]ome evidence of clean-up effort in the back yard since the first inspection, such as articles piled more neatly and dead trees chopped into firewood and stacked". It was noted that Mr. DeFrank was to confer with the Township Attorney.

Notices were served upon Peters directing him to remove the unregistered vehicles and to clean up his property. A reinspec-

tion was made on September 18, 1972 and it was ascertained that conditions had not improved substantially.

On September 28, 1972 Reikowski, acting as Zoning Officer and Building Inspector, issued a complaint which charged that Peters was maintaining ten unregistered vehicles on his property and a vast quantity of other articles. The complaint further charged that "The continued random storage of multiple types of debris on the property is contrary to the public health and safety of the citizens of the Township of Hopewell, is violation of the Public Health and Nuisance Code and it is in violation of other ordinances of the Township. Said debris constitutes a health hazard in that it encourages the harborage and breeding of rodents and insects and constitutes a danger to [sic] injury to persons on or about the premises, particularly those of tender years." The complaint asked that Peters be summoned to appear before the Township Board of Health "and dealt with according to law".

The complaint was served upon Peters and a hearing scheduled before the Board of Health. In Hopewell Township the Township Committee also serves as the Board of Health. On the first date scheduled for the hearing Peters requested an adjournment in order to obtain an attorney. The hearing was adjourned to October 26, 1972, at which time Peters elected to proceed without an attorney. Testimony and other evidence was received as to the condition of Peters' property. Peters testified and, according to the Board of Health's Factual Summary, Findings and Order, "offered a number of philosophic reasons for keeping it, all of which may properly be summed up in his own phrase that 'everything needs a home'." The Factual Summary recited that "While the Defendant claims that some of the junk or parts thereof are more properly described as antique automobiles, he fixes the item value as being someplace between $10 and $800. The so-called antiques, in their present rusted condition, are of minimal value and, in any event, are not made less of a nuisance or hazard by such adjectival denomination."

The Factual Summary also noted that the Board of Health received a petition containing twenty-one signatures of persons living near the premises. It further noted that on a prior occasion Peters had been fined under a local ordinance for maintaining and storing junk automobile parts. His conviction was affirmed by the County Court and he abandoned his appeal to the Appellate Division of the Superior Court.

The Board of Health's Finding and Order (which followed its summary of the evidence before it) read as follows:

### Findings

It is undisputed that the junk automobiles, parts of machinery, bottles, lumber and other multiply described debris litters the Defendant's premises. It is also undisputed that there is an uncovered ditch and a combination of combustible trees and flammable liquids.

The substances and conditions, as well as the manner of maintenance, constitutes a nuisance, a source of potential injury and a health hazard. The dangers thus created are magnified by the fact that there are admittedly a great number of children in the neighborhood who play on the Peters property in particular. The Township of Hopewell has adopted a Public Health Nuisance Code that has, as well, an Ordinance prohibiting the keeping of junk automobiles and declaring them a nuisance. This Defendant is in obvious violation of both as well as subject to the provisions of R.S. 26:3–49. The Defendant has no outstanding municipal permits which would justify or validate the keeping of building material or the existence of a trench.

### Order

It is hereby ORDERED that the said Carl Peters shall, on or before December 20, 1972, remove and abate the several nuisances existing on the premises, more particularly,

1. The Defendant shall remove all unregistered or inoperative motor vehicles and their parts.

2. The Defendant shall remove all scrap junk and debris from the premises, namely, cans, bottles, broken pieces of machinery, wood, scrap iron, sheet iron, broken doors, motor vehicle parts, wires, bed parts, bottles, cinderblocks, used lumber, broken wagons and all other things of similar description.

3. Defendant shall fill to ground level all excavations on the premises.

4. The Defendant shall either remove or saw up and neatly pile, if he intends to use as firewood, the Christmas trees that are scattered around the premises.

5. The Defendant shall demolish the lean-to structure which is fashioned of unmortared cinderblocks and remove the cinderblocks from the premises.

In the event that all of the above is not completed by December 20, 1972, the Defendant is hereby notified that the Board of Health, without further notice, shall proceed to abate the several nuisances and the expense incurred in such removal and abatement shall thereafter be recovered from the Defendant.

Neither the complaint nor the pretrial order in this case challenged the regularity of the proceedings which led to these findings and order, and neither challenged the validity of the order to Peters to remove and abate the nuisance. N.J.S.A. 26:3–45, et seq.; cf., Ajamian, et al. v. Township of No. Bergen, et al., 103 N.J.Super. 61, 246 A.2d 521 (Law Div. 1968); aff'd, 107 N.J. Super. 175, 257 A.2d 726 (App.Div.1969), cert. den., 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970). Just prior to the trial and from time to time during the course of the trial, Peters sought to challenge the proceedings and the findings and order of the Board of Health, claiming that they were part of an unlawful conspiracy against him perpetrated by townspeople and by the Township. I did not permit expansion of the issues in this case at that late date but did permit some evidence concerning the Board of Health proceedings insofar as it related to the nature and condition of the property which Peters stored on his premises and which was seized and destroyed in late December, 1972.

The findings and order were served upon Peters' wife on November 30, 1972. Peters made some ineffectual attempts to comply, but he did not remove the vehicles, and the over-all condition of the premises did not change significantly. Faced with this situation the Township took steps to enforce the order. The Township's Health Officer, Fred DeFrank, retained the services of defendant James C. Johnson, who in 1972 was engaged in the towing and automobile mechanics business. Johnson, in turn, arranged for defendants Jeffrey Wittkop, Richard Smith and Samuel Little to participate in the clean-up. Reikowski, DeFrank and Johnson agreed upon the equipment which would be used—Wittkop's bulldozer and two trucks with flat bed trailers supplied by Johnson.

At about 11:00 in the morning of December 27, 1972 Johnson, Wittkop, Smith and Little arrived at Peters' home with the equipment described above. Reikowski also arrived and was in general charge of the operations which followed. Reikowski had requested that Chief of Police Mathew J. Maloney and Patrolman Clarence Powell be on hand.

When this crew drew up before Peters' residence they found Peters working on his wife's automobile which was in front of the driveway with the right front wheel raised on a bumper jack. Maloney read the order to Peters and requested that he not interfere with the clean-up. Johnson requested that Peters remove the bumper jack so that the automobile could be moved out of the way. Peters and Maloney are in partial but not total disagreement as to what happened next. Maloney testified that Johnson started lowering the car and that Peters then grabbed the jack handle from him and threatened to strike him with it. Maloney further testified that he took the jack handle from Peters and returned it to Johnson, at which point Peters assaulted Johnson. Maloney attempted to arrest Peters, who resisted violently and was subdued after a 45-minute struggle only with the help of Patrolman Powell. Powell was bitten and kicked, for which he was treated at a hospital emergency room. Maloney suffered

chest pains and was taken to the same hospital. Peters was taken into custody, and later committed to a psychiatric hospital for observation, from which he was released after several weeks.

Peters denies that he ever threatened Johnson with the jack handle. He was a witness to the highly destructive early phase of the clean-up operations, which will be described shortly. Peters believed that he had a constitutional right to protect his property and testified that he was not going to leave his property without a struggle.

Peters' violent departure from the scene is not the subject of this law suit, and its significance for present purposes is simply to suggest the atmosphere in which the entire operation was conducted.

The numerous photographs which certain members of the Peters family took during the clean-up and the testimony of two witnesses establish graphically the manner in which the operation was conducted.

Peters' wife, Jean Peters, was a reliable and accurate witness. She is obviously an understanding and sympathetic spouse who for years has been attempting (without visible success) to counteract her husband's compulsion to clutter, but I conclude she reported her observations objectively. Another witness was the mother of a thirteen year old friend of one of Peters' sons. Peters' son had asked his friend for help when the clean-up operation began. The friend's mother accompanied him to Peters' residence. She hardly knew the Peters, and her observations appeared to be totally unaffected by personal interest or bias.

Notwithstanding the fact that Peters' obsessive behavior compelled the Township to remove the accumulation of automobiles and other items from his property, the manner of the removal cannot be justified. Wittkop's bulldozer moved back and forth through the 100′ × 150′ lot with reckless abandon. The ground was unfrozen and the treads of the vehicle, particularly as it was pivoted, dug deeply into the soil. Some of the trees were knocked down; others were scarred or bent over; still others were left with their roots exposed. As the bulldozer scooped up tools, logs, piles of stone,

children's bicycles and other toys, furniture and vast amounts of debris, its blade dug into the topsoil, removing or displacing it. At one point the bulldozer damaged a portion of the house and at another it struck a garage. While crossing the property it crushed Peters' cesspool.

The only property dealt with carefully were the cinderblocks. With the assistance of neighborhood boys these were loaded upon one of Johnson's trailers. Peters claims he saw these cinderblocks at Johnson's place of business, identifying them by paint marks. Johnson denied taking the cinderblock and testified that the cinderblocks at his premises were left over from a garage he had built. One does wonder why stacked cinderblocks were a health hazard on Peters' property and not a health hazard on Johnson's property. Be that as it may, I cannot say whether the cinderblocks were taken to Johnson's place or whether they were taken with the rest of Peters' property to the town dump. They were never accounted for.

While the bulldozer was charging about the premises, while the cinderblocks were being piled on the trailer, and while the automobiles were being smashed and hauled away, neighborhood children screamed abuse and profanities at Mrs. Peters and her children. They threw clods of earth at the Peters' property. Neither the parents and other adults watching the proceeding nor the Township officials took any steps to interfere with this behavior.

Perhaps most destructive of all was the manner in which the automobiles were removed. The photographs in evidence demonstrate wanton disregard for these automobiles. Typically an iron bar or chain was run through the front windows of an automobile, the chain was linked over the teeth of the bulldozer blade, and the bulldozer then lifted the vehicle and placed it on a flat bed trailer. When the windows of an automobile were not open, instead of rolling them down the clean-up crew smashed them with the iron bar which was then inserted so as to extend through the car, protruding from each side for attachment

to the chain. While being pushed or lifted or hauled, the sides, tops and fenders of the automobiles were crushed and bent.

It is defendants' contention that this was the only way to remove the automobiles since many had some or all of their wheels removed and could not be towed and rolled onto the trailers. Peters and his wife testified, truthfully I believe, that in those cases where the wheels had been removed they had been placed either beside the vehicle or inside it where they could easily have been put back in place. Other vehicles had two or all wheels in place. I simply do not believe that with proper and readily available equipment the clean-up crew could not have moved the automobiles onto the flat bed trailers in the condition in which they were without causing them significant damage. Further, with the exercise of a moderate amount of care and skill, these experienced persons could have put the wheels back on where they had been removed and simply rolled the vehicles onto the truck.

It is quite obvious that the Township officials and the men they employed had no intention of exercising care. They had surveyed the premises well in advance; they brought with them on December 27th no equipment such as dollies or a tow truck which would have permitted the careful loading of the vehicles. They went about their work with an abandon typified by the manner in which the bulldozer was operated on this small parcel of land. The greater expense of using proper removal procedures was no excuse for not using them since Peters was required to pay for the operation in any event.

After the automobiles were loaded on the flat bed trailers they were taken to the town dump where they were left. Several months later they simply disappeared. The Township and its officials have offered no explanation as to what happened to them.

There is no question that just before the clean-up operation these eleven automobiles had value. Defendants' expert conceded as much although, not surprisingly, his opinion of value differed substantially from Peters'. Peters had no expert witness but I permitted him, as the owner, to testify as to his opinion of the value of his automobiles. He is very knowledgeable in the field of old cars and his opinion is not without weight. I must discount it to some extent because of his tendency to view all his possessions in an unrealistically favorable light.

Having heard the testimony concerning the condition and value of these automobiles and having examined the photographs of them in the condition they were in while being or after being subjected to the clean-up operations, I have arrived at an opinion of their value on December 27, 1972, just prior to their removal. This value includes the value of the parts, tools and components which were stored in or about the automobiles but not actually installed. The following chart lists the automobiles and sets forth Peters' opinion of their value, defendants' expert's opinion, and my conclusion:

| Automobile | Peters' Value | Average Defendants' Value | Finding of Value |
|---|---|---|---|
| 1. '62 Studebaker, 4 Dr. Stn. Wag., red (P 27). | $ 800 | $ 0 | $ 150 |
| 2. '60 Studebaker, 4 Dr. Stn. Wag., yellow (P-95). | 900 | 125 | 250 |
| 3. '52 Studebaker, 2 Dr. Sedan, green and white | 1200 | (no opinion) | 100 |
| 4. '52 Studebaker, 2 Dr. Starlite Coupe, green (P-99). | 1400 | 20 | 300 |
| 5. '49 Studebaker Pickup Truck, ¾ ton, red (P-101). | 1000 | 175 | 400 |
| 6. '51 Kaiser 4 Dr. Traveller, green (P-13). | 2500 | 50 | 500 |
| 7. '53 Kaiser 4 Dr. Sedan, red (P-58). | 1350 | 0 | 200 |
| 8. '53 Kaiser 4 Dr. Sedan, blue & black (P-106). | 1350 | 0 | 150 |
| 9. '53 Volkswagen 2 Dr. Beetle, white (P-10, P-35). | 3500 | 200 | 800 |
| 10. '58 Volkswagen 2 Dr. Beetle, black | 1000 | (no opinion) | 300 |
| 11. '41 Plymouth, 2 Dr. Sedan, green (P 15). | 1200 | 88 | 350 |
| Totals .... | $16,200 | $658 | $3500 |

The only other item of seized personal property upon which there is evidence to support a value are the concrete blocks. Peters testified that there were 888 of them, having an average per block value of

thirty-five cents in December, 1972, for a total of $310.80.

I did not allow Peters to testify as to the value of the myriad other items of personal property removed from his property, including 9 batteries, 85 gallons of motor fuel, 57 items of Kaiser parts, 218 items of Plymouth, Dodge and Packard parts, 51 items of Studebaker parts, 124 items of Volkswagen parts, 46 structures located on his property, lumber and millwork items, 184 cubic feet of driveway gravel, 315 items of miscellaneous building materials such as roofing, stainless steel, flashing, water pumps, paper, porch rails, 52 items of children's toys, 30 items of garden plants, 22 damaged trees, 25 removed trees, 25 items of garden furniture, 745 items of garden equipment such as flower pots, 36 items of garden tools, garden materials such as lime, soil and grass, 2,620 cubic feet of topsoil, and 169 items of personal property not otherwise listed. Just to mention this list gives an indication of the crowded nature of Peters' premises. I conclude that Peters, even though he was the owner of all this material, does not have sufficient expertise to give an opinion as to its value in December, 1972. Further, having examined the photographs of this property and having considered the testimony and other evidence concerning its nature and condition, I conclude that although these possessions had great value to Peters they were worth very little on the basis of any objective standard.

Peters claims damages for destruction of the value of his real estate. Since he was the owner I permitted him to testify as to his opinion of the value before and after the December, 1972 episode. In his opinion, the value of the real estate was $38,000 before that episode and $5,500 afterward. Defendants' real estate expert testified that the Peters' real estate would have had a value of $37,000 to $38,000 in December, 1972 if it were in a marketable condition. In her opinion it was not in a marketable condition when littered with Peters' automobiles, structures and debris. She further testified that after the clean-up it was in a marketable condition and could have brought the $37,000 to $38,000 price. She conceded on cross-examination that if the

cesspool had been crushed in the course of the clean-up operation the cost of repair would have to be deducted from that price. There is no evidence as to what it would cost to repair the cesspool.

I conclude that defendants' expert correctly evaluated the effect of the clean-up upon the market value of Peters' property. It rendered marketable previously unmarketable property having a value of $37,000–$38,000. It resulted in the destruction of the cesspool, and the cost of replacement or repair was the only loss in value of the real estate caused by the defendants' actions. Peters' opinion that the value declined to $5,500 is based upon a theory which I cannot accept as controlling, namely, that the property became worth no more than $5,500 because the building inspector repeatedly refused to issue building permits for the various structures which he had erected or wished to erect on the property.

These, then, are the facts, the legal consequences of which must be determined.

### Conclusions of Law

A. *Jurisdiction* : Peters charges that he was deprived of his property without due process of law in violation of the Fourteenth Amendment of the United States Constitution. He alleges that this deprivation was caused by persons acting under color of state law, and he brings his action seeking substantial damages under 42 U.S.C. § 1983. The Court has jurisdiction over these claims. 28 U.S.C. §§ 1331, 1343(a).

■ B. *Deprivation of Property without Due Process of Law* : There can be no question that Peters was deprived of property. It must be determined whether the deprivation was without due process of law.

The complaint does not challenge the validity of the proceedings resulting in the order requiring Peters to remove the offending property from his premises, nor does it challenge the Township's right to remove the property at Peters' expense if he failed to do so. I refused to permit Peters to expand his claims at the time of trial to challenge those proceedings.

It seems very clear that when it directed Peters to remove the property and when it authorized Township officials to remove it if Peters did not, the Township was acting well within its statutory authority to declare and abate nuisances. N.J.S.A. 26:3–45, *et seq.; Ajamian v. Township of No. Bergen, supra.* This authority, however, is not unlimited. In *Ajamian* the Court noted:

> But the right to summarily abate a nuisance is not without limitations. The right is based upon necessity, and the necessity must be present to justify its exercise. 39 *Am.Jur., Nuisances,* § 184, pp. 455–7; *State, Avis, Prosecutor v. Borough of Vineland,* 56 N.J.L. 474 (Sup.Ct. 1894); *Hutton v. City of Camden* [39 N.J.L. 122 (Err. & App.1876)], *supra.* The remedy must be confined to what is necessary to abate the nuisance, and no more injury must be done to the rights of individuals than is necessary to accomplish the abatement. 39 *Am.Jur., supra* ; 25 *Am.Jur., Health,* § 40, p. 317. Thus, had defendants here attempted to destroy this building, undoubtedly the threat would be enjoined pending a hearing, as was done in *Vanderhoven v. City of Rahway,* 120 N.J.L. 610 [1 A.2d 303] (Sup.Ct. 1938) and *Rosenberg v. Sheen,* 77 N.J.Eq. 476 [77 A. 1019] (Ch. 1910), which cases are cited by plaintiff in support of his argument.

At p. 80, 246 A.2d 521.

I have found that the persons implementing the Township's order went far beyond what was necessary to abate the nuisance and engaged in conduct which constituted either deliberate destruction of his property or a reckless disregard of whether his property was destroyed. What should have been an orderly and careful removal of automobiles and large quantities of other property became instead an assault upon a family's home site. The fact that proper procedures would have taken longer and cost more is immaterial since Peters was paying for the operation, an obligation secured and ultimately collected by a lien on his real estate. The manner and the circumstances in which the property was removed partook of neighborhood and official

revenge for the years of frustration which Peters had caused.

This conduct clearly was not sanctioned by State law. Nor is it sanctioned by the United States Constitution.

The Fourteenth Amendment provides that no State shall "deprive any person of . . . property, without due process of law". The unnecessary destruction of Peters' property in this case and the seizure of the personal property without any steps being taken to provide for its safekeeping constituted a deprivation of property without due process of law.

42 U.S.C. § 1983 gives a right of action against any person who, under color of state law, causes the deprivation of a right secured by the Constitution. Defendants urge, however, that under *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), Peters does not have a § 1983 claim because he had an adequate remedy under the New Jersey Tort Claims Act, N.J.S.A. 59:1–1, *et seq.* In *Parratt* a prison inmate sued prison authorities under § 1983 for the negligent loss of a hobby kit. The United States Supreme Court held that the State provided adequate remedies for recovery of the loss and that the existence of such remedies satisfied the Due Process Clause.

Here, however, we are dealing not with a negligent injury to property; we are dealing with intentional injury. The contention which defendants advance was raised in *Tarkowski v. Hoogasian,* 532 F.Supp. 791 (D.Ill.1982). In that case plaintiff brought a § 1983 action charging that the State's attorney and his agents, while upon plaintiff's lands pursuant to a court order, removed or destroyed items of property which were not within the order. Denying defendants' motion to dismiss for lack of jurisdiction and failure to state a claim, the Court stated:

> Although *Parratt* concerned an allegation that a state official's negligent conduct had caused the loss of the plaintiff's property, its logic does not distinguish between negligent and intentional conduct. But where intentional acts are al-

leged, the existence of post-deprivation state remedies does not mean that the alleged conduct did not violate due process. This court does not read *Parratt* as going beyond its own facts. The *Parratt* Court certainly did not repeal § 1983 in cases in which a state official's intentional deprivation of constitutional rights including property rights is involved simply because a state tort action may be available. Only Congress could effect such a repeal and it has not done so.

I think the reasoning of the Court in *Tarkowski* is sound. *Parratt* does not require the conclusion that by reason of the existence of the New Jersey Tort Claims Act Peters lacks a § 1983 cause of action.

C. *State Action*: Clearly the episode which took place on December 27, 1972 was state action. It was authorized by an order of the Township's Board of Health and it was organized and directed by Township officials. Defendant Reikowski, who supervised the operations that day, was the Township Building Inspector and Zoning Officer.

■ Defendants Johnson, Wittkop, Little and Smith were not employees of the Township in December, 1972. They were retained simply to participate in the clean-up operation. Private citizens cannot be sued under § 1983 for non-state related activities, *e.g.*, *Magill v. Avonworth Baseball Conference*, 516 F.2d 1328 (3d Cir. 1975). However, if private persons willfully participate in joint action with a state official they are acting under color of state law. *Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Black v. Bayer*, 672 F.2d 309 (3d Cir. 1982). These defendants did willfully participate with Township officials in the conduct which deprived Peters of his property without due process of law, and consequently they acted under color of state law.

■ D. *Liability of the Township*: A municipality may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation or decision. A municipality may not be held liable under that statute for actions of its agents under a theory of respondeat superior. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ In the present case the Township cannot be held liable for the wrongful conduct which took place on December 27, 1972 simply because the persons perpetrating that conduct were its agents. For liability to attach it must be found that the actions which took place that day may fairly be said to represent official policy. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Black v. Stephens*, 662 F.2d 181 (3d Cir. 1981). Usually official policy is determined by the chief executive or the governing body of a municipality. However, authority to make decisions for a municipality can be delegated to an administrator and, if so, his action taken pursuant to such authority will subject a municipality to § 1983 liability. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980). The touchstone is whether the official responsible for the violation of constitutional rights is one whose edicts or acts may fairly be said to represent official policy. *Black v. Stephens, supra*, at 191.

In the present case I conclude that the evidence establishes that the actions taken by the Township officials on December 27, 1972 represented official policy even though the governing body did not direct the manner in which its order was to be implemented. Authority and discretion for implementing the order was delegated to the highest ranking full-time Township officials. The Township's Health Officer, De-Frank, retained the services of Johnson. The Health Officer and the Township's Building Inspector and Zoning Officer planned the operation well in advance and agreed upon the kind of equipment to be used. The kind of equipment used (and the kind of equipment not used) dictated the manner in which the clean-up operation was to be conducted, making it virtually impossible to proceed in a careful, non-destructive

way. When D-Day arrived, Reikowski personally supervised the work and the Township's Chief of Police was on hand (until felled by chest pains during his struggle with Peters). Under the circumstances, the manner in which Peters' property was seized, destroyed and discarded constituted official policy. The Township, therefore, is subject to suit under § 1983.

■ E. *The Township's Statute of Limitations Defense*: The Township urges that even if it is liable under § 1983 it is entitled to the defense of the New Jersey Tort Claims Act statute of limitations. It cites *Gipson v. Township of Bass River*, 82 F.R.D. 122 (D.N.J.1979), and certain unreported opinions of mine which hold that in a § 1983 suit against a New Jersey governmental entity the applicable statute of limitations is N.J.S.A. 59:8–8. This statute provides that a claim against an entity such as a municipality for injury to property "shall be forever barred" if "[t]wo years have elapsed since the accrual of the claim".

The conduct giving rise to this litigation occurred on and perhaps shortly after December 27, 1972. The complaint was filed just short of six years after the cause of action arose. The general New Jersey statute of limitations governing actions for tortious injury to real and personal property and for taking personal property requires that such actions shall be commenced within six years after the cause of action shall have accrued. N.J.S.A. 2A:14–1. There appears to be no dispute that the action is timely as to the individual defendants in this case. The question is posed whether the six-year or two-year statute is applicable to the Township.

There being no federal statute of limitations with respect to civil rights actions arising under 42 U.S.C. § 1983, a district court is required to apply the state statute of limitations applicable to analogous actions. *Howell v. Cataldi*, 464 F.2d 272 (3d Cir. 1972). As the Court stated in *Ammlung v. City of Chester*, 494 F.2d 811 (3d Cir. 1974), "The limitation period to be applied is that which the state would apply if the action had been brought in a court of that state." At 814.

Although the Courts of Appeals in the various Circuits agree with this general approach to the applicable statute of limitations in § 1983 actions, the approach has been implemented in two distinct ways when the state has no statute of limitations of general applicability specifically addressing actions involving violations of constitutional rights.

In that situation the rule in the Third Circuit is that "the applicable statute of limitations must be determined from the nature of the conduct involved". *Ammlung, supra*, at 814. Thus, if a civil rights action arises in the District Court in New Jersey alleging unjustifiable assault by a police officer, the two-year statute governing actions for injuries to the person, N.J.S.A. 2A:14–2, will apply. *Hughes v. Smith*, 264 F.Supp. 767 (D.N.J.1967), aff'd 389 F.2d 42 (3d Cir. 1968) (*per curiam*). If, as in the present case, wrongful deprivation of property is alleged, the six-year statute will apply. *Page v. Curtiss-Wright Corp.*, 332 F.Supp. 1060 (D.N.J.1971).

This method of selecting an appropriate statute of limitations is not followed in other circuits. The Court of Appeals for the Seventh Circuit explained the difference between the two approaches in *Beard v. Robinson*, 563 F.2d 331 (1977), *cert. den.*, 438 U.S. 907, 98 S.Ct. 3125, 57 L.Ed.2d 1149 (1978). There, the Court had to resolve a conflict in its own decisions. In *Jones v. Jones*, 410 F.2d 365 (1969), *cert. den.*, 396 U.S. 1013, 90 S.Ct. 547, 24 L.Ed.2d 505 (1970), it had utilized the Third Circuit method of selecting an appropriate statute of limitations. In *Wakat v. Harlib*, 253 F.2d 59 (7th Cir. 1958), it applied a different method. Selecting the method approved in *Wakat*, the Court stated in *Beard*:

Upon reflection, it seems to us that *Wakat* and *Jones* cannot stand together, for underlying the inconsistent results reached therein are two inconsistent approaches to determining the applicable statute of limitations. The *Wakat* approach treats all claims founded on the Civil Rights Acts as governed by the five-year Illinois statute of limitations appli-

cable to all statutory causes of action that do not contain their own limitations periods. *Jones*, on the other hand, looks beyond the fact that a statutory cause of action has been alleged and seeks to characterize the facts underlying plaintiff's claim in terms of traditional common law torts for purposes of determining the applicable state statute of limitations. Faced with these two conflicting approaches that have generated inconsistent results within the Circuit, we now believe it is necessary to overrule *Jones* and adopt the *Wakat* rule as the law of the Circuit for the following reasons.

We believe our choice of the *Wakat* rule is compelled by the fundamental differences between a civil rights action and a common law tort. The Civil Rights Acts do not create 'a body of general federal tort law.' *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). Rather, they

> "creat[e] rights and impos[e] obligations different from any which would exist at common law in the absence of statute. A given state of facts may of course give rise to a cause of action in common-law tort as well as to a cause of action under Section 1983, but the elements of the two are not the same. The elements of an action under Section 1983 are (1) the denial under color of state law (2) of a right secured by the Constitution and laws of the United States. Neither of these elements would be required to make out a cause of action in common-law tort; both might be present without creating common-law tort liability." *Smith v. Cremins*, 308 F.2d 187, 190 (9th Cir. 1962) (footnote and citations omitted).

As Justice Harlan suggested with regard to the Civil Rights Acts,

> "a deprivation of a constitutional right is significantly different from and more serious than a violation of a state right and therefore deserves a different remedy even though the same act may constitute both a state tort and the deprivation of a constitutional right." *Monroe v. Pape*, 365 U.S. 167,

194, 81 S.Ct. 473, 488, 5 L.Ed.2d 492 (1961) (concurring opinion).

By following the *Wakat* approach of applying a uniform statute of limitations, we avoid the often strained process of characterizing civil rights claims as common law torts, and the

> "[i]nconsistency and confusion [that] would result if the single cause of action created by Congress were fragmented in accordance with analogies drawn to rights created by state law and the several different periods of limitation applicable to each state-created right were applied to the single federal cause of action." *Smith v. Cremins, supra* at 190.

Moreover, we note that the *Wakat* approach of looking to a general state statute of limitations prevails in most of our sister circuits, while the *Jones* approach of looking to the underlying tort to determine the applicable state statute of limitations has been followed consistently only by the Third Circuit. (Footnotes omitted), at pp. 336, 337.

*See, also, Ney v. State of California*, 439 F.2d 1285 (9th Cir. 1971); *Donovan v. Reinbold*, 433 F.2d 738 (9th Cir. 1970); *Schorle v. City of Greenhills*, 524 F.Supp. 821 (S.D. Ohio 1981); *Gunther v. Miller*, 498 F.Supp. 882 (D.N.M.1980); *Davidson v. Koerber*, 454 F.Supp. 1256 (D.Md.1978).

The question whether a time limitation contained in a state torts claim act is applicable to a § 1983 action against a state entity has been decided in circuits which follow the Seventh and Ninth Circuits' approach in selecting an appropriate statute of limitations.

In the *Donovan* case, *supra*, the Ninth Circuit held that the shorter California Tort Claims Act statute of limitations was not applicable in a § 1983 action against two municipal police officers. It stated:

> Congress has not evinced any intention to defer to the states the definition of the federal right created in section 1983, or to adopt the states' remedies or procedures for the vindication of that right. It has never indicated an intent to engraft onto

the federal right state concepts of sovereign immunity or of state susceptibility to suit, which are the concepts that are the roots of the California Tort Claims Act. Indeed, the history of section 1983, summarized in *Monroe v. Pape*, supra, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, vividly demonstrates that state concepts of sovereign immunity were alien to the purposes to be served by the Civil Rights Act. (*See also, Beauregard v. Wingard* (S.D.Cal.1964) 230 F.Supp. 167, 173.) An incorporation of such state created policies 'would practically constitute a judicial repeal of the Civil Rights Act.' (*Hoffman v. Halden* (9th Cir. 1959) 268 F.2d 280, 300; *Jobson v. Henne* (2d Cir. 1966) 355 F.2d 129.) At p. 742.

To the same effect are *Ney v. State of California*, supra; *Gunther v. Miller*, supra; but cf., *Fine v. City of New York*, 529 F.2d 70 (2d Cir. 1976). The question arises whether these cases should be followed in the Third Circuit which has adopted a different general approach in selecting a statute of limitations in § 1983 cases.

In *Gipson v. Township of Bass River*, supra, the Court held that the Third Circuit would not apply the Ninth Circuit *Donovan* rule, stating "the Ninth Circuit does not employ the Third Circuit's approach of 'characterizing' the underlying action and then applying the most analogous state limitation period." At p. 129. The Court further distinguished the *Donovan* decision on the basis that (i) prior to the enactment of the California Tort Claims Act the Ninth Circuit had consistently applied a three-year statute of limitations and (ii) in *Donovan* the defendants sought the benefit of *all* the Tort Claims Act limitations and procedures.

Notwithstanding the persuasiveness of the *Gipson* opinion, I do not think the law as it exists in the Third Circuit calls for application of the time limitation specified in the New Jersey Tort Claims Act.

Under the ruling the Township seeks the two-year statute would apply to public entities and the six-year statute would apply to everyone else. This is not a distinction based on the nature of the conduct involved; it is a distinction based on the category of person involved. It would produce the anomalous result that five defendants in the present case would be governed by a six-year statute of limitations and one defendant would be governed by a two-year statute of limitations when charged with exactly the same conduct and when relief is sought under precisely the same federal statute.

The New Jersey Tort Claims Act is a detailed statute, N.J.S.A. 59:1–1 through N.J.S.A. 59:12–3, in which the State seeks to moderate "the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity". N.J.S.A. 59:1–2. However, the State intended that the modifications of the traditional doctrine of sovereign immunity be carefully circumscribed and "that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein". N.J.S.A. 59:1–2. The sections following this legislative declaration of policy contain detailed provisions defining the bases for suits against governmental agencies and designating the procedures to be followed when pursuing claims covered by the Act. Among these provisions is the statute of limitations which the Township urges be applied in this case. In *Gipson* the Court recognized that the many protective features of the Act limiting suits against governmental entities could not be applied to limit a plaintiff's rights in § 1983 actions. It is difficult to understand why the time limitation should be an exception.

If New Jersey had not modified its doctrine of sovereign immunity to permit suit against municipalities and other state entities, those entities would nevertheless have been subject to suit on § 1983 claims and the general six-year statute of limitations would have applied. There is no reason under either the provisions of § 1983 or the Third Circuit procedure for selecting a statute of limitations why the statute of limitations applicable to governmental entities should change simply because the State of New Jersey has decided to relax the prohi-

bition against tort suits against such entities.

The Third Circuit directs the district court to look to the "nature of the conduct involved", not to the kind of person who engaged in that conduct. The nature of the conduct involved in this case is the unlawful destruction and seizure of real and personal property. That kind of conduct is covered by the six-year statute of limitations. Were I to apply the two-year statute to the Township I would be making a selection on the basis of the kind of person or entity involved and not on the basis of the nature of the conduct.

New Jersey courts appear to have adopted the same view of its Tort Claims Act—that is to say, it is generally inapplicable to § 1983 actions. *Woodsum v. Pemberton Tp.*, 172 N.J.Super. 489, 521, 412 A.2d 1064 (Law Div. 1980), *aff'd*, 177 N.J.Super. 639, 427 A.2d 615 (App.Div.1981). I see no reason why this observation is not applicable to the time provisions of the Act as well as to its other provisions.

For these reasons the six-year, not the two-year, statute will be applied to all defendants in this case, including the Township of Hopewell.

■ *F. Defendants' Good Faith Defense*: A good faith defense may not be asserted by the Township. *Owen v. City of Independence, supra.*

Although the other defendants were acting pursuant to a valid order of the Township's Board of Health, under the circumstances of this case as described above they either knew or should have known that the manner in which they seized, destroyed and disposed of Peters' property violated his constitutional rights. Consequently they are not entitled to the defense of good faith. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

■ *G. Damages*: Peters' is entitled to recover for the losses which he has proved which were caused by defendants' unlawful conduct. The value of the automobiles which were seized, severely damaged and disposed of without trace is $3,500. The value of the cinderblocks seized and disposed of without trace is $310.80. Proof is lacking of further damages on account of the damaged and seized property.

In this kind of case an award for distress, mental suffering and emotional anguish may be made if it can be shown to have been caused by a defendant's wrongful conduct. *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Niederhuber v. Camden Cty. Vocational, Etc.*, 495 F.Supp. 273 (D.N.J.1980). Here there is no question that Peters was aroused to a fever pitch by the events which took place on December 27, 1972, and that he suffered and continues to suffer distress as a result of the incident. On the other hand, his outrage was also occasioned by the lawful order and would have been incurred to a considerable extent by *lawful* action which was supposed to have been taken pursuant to it. He was (and apparently continues to be) in a state of continuing distress, mental suffering and emotional anguish not only because of the defendants' wrongful conduct but also because of perfectly proper limitations imposed upon his use of his property and appropriate actions of the municipality to enforce those limitations. Thus the emotional anguish caused by the unlawful events of December 27, 1972 and their sequelae is a wave on a sea of emotional anguish for which defendants cannot be held responsible. Though this additional anguish for which defendants are responsible is difficult to measure in monetary terms, it undoubtedly exists, and I will award $3,000 on its account.

Punitive damages may not be awarded against a municipality, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), but in appropriate cases such damages may be awarded against individuals. *Harris v. Harvey*, 605 F.2d 330 (7th Cir. 1977), *cert. den.*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980). Peters' own conduct in this case, however, was outrageous. He was and apparently still is obsessed with his notions about his unlimited right to use his property in utter disregard of the legitimate interests of his neighbors and the laws of his municipality. Although defendants' actions cannot be excused, they were not a

totally unnatural response to Peters' own misconduct. In such circumstances punitive damages would be inappropriate.

H. *Peters' Post Trial Motions*: After the trial was concluded Peters' filed a number of motions. They will be disposed of as follows:

1. Peters filed a "Motion for Investigation of support of invalid and fraudulent Court Order by 'Health' man, DeFrank". In these papers Peters attacks the validity of the Board of Health order which precipitated the December 27, 1972 episode. At the trial I denied Peters' request to amend his complaint in this regard, and for the reasons I denied that request I will deny this motion.

2. Peters moves for time to evaluate the property unlawfully removed. Peters should have taken steps to accomplish this prior to the trial. It is too late to do it now, and the motion will be denied.

3. Peters moves to reopen the hearings for the testimony of eleven persons to show such things as the falseness of the basis for the October, 1972 order, the values of the automobiles, the intentional nature of the damage to Peters' property, the existence of a conspiracy extending over many years to deny Peters' civil rights and to steal his automobiles, where the automobiles went after they were seized and stored at the Township dump, and the existence, in 1973, of a fraudulent appraisal of Peters' automobiles. In part, the testimony sought relates to issues which are not part of this case (*e.g.*, the invalidity of the October, 1972 order) or are otherwise irrelevant (the existence of a fraudulent appraisal in 1973) or have already been established in Peters' favor (the intentional nature of defendants' conduct). In any event, it is too late to introduce additional evidence. If I were to grant Peters' motion, defendants would undoubtedly ask for the opportunity to introduce additional evidence, a request which might well be justified.

There must be an end to this trial, and Peters' rebuttal evidence on January 21, 1982 marked that end. Peters' motion to introduce additional testimony will be denied.

4. Peters moves to join Edward Holcombe as a defendant on the ground that the testimony at the trial established that he was the Township's bulldozer operator at the Township dump on and after December 27, 1972—the person who buried Peters' automobiles or knows where they went.

Apart from the obvious statute of limitations bar, it is too late to join a party as a defendant after the case has been tried. This motion will be denied.

5. Peters moves to join the Township of Hopewell. I do not understand his explanation of this motion, but since the Township is already a defendant it will be denied.

6. Peters has filed a "Motion to Remand List of Complaints to Lower Courts and to Investigatory Bodies". I have difficulty understanding what relief Peters seeks in this motion.

Peters submitted to me, in conjunction with his post trial brief, a document entitled Appendix. It is 4½ inches thick and contains a large assortment of materials. Book 2 of the Appendix purports to be a list of complaints of violations of the law by agents and agencies of Hopewell Township in connection with the December 27, 1972 episode. In his Motion to Remand Peters refers to these "thousands of complaints and hundred of thousands of Counts". Apparently it is these complaints that he asks be remanded to lower courts and investigatory bodies.

There are no lower courts or investigatory bodies to which I can remand these complaints and, therefore, the motion is denied. Further, the material in the so-called Appendix is not material which I can consider in this case. It is not evidence introduced at trial or otherwise a part of the record. Peters will be directed to take back his Appendix. If he does not do so within fifteen (15) days of his receipt of the order implementing this opinion I will dispose of it.

7. Finally, Peters moves to treat the captions on the photographs which are in evidence as testimony. Numerous photographs were admitted as plaintiff's exhibits.

Peters had written on the backers to which the photographs were attached descriptive and other material. Some of this other material was conclusory in nature. Some of it gave vent to Peters' feelings. At the time I admitted the photographs in evidence I ruled that the written material accompanying them was not evidence. Peters and other witnesses testified fully as to the subject matter of each photograph. They were subject to cross-examination on their testimony. I am confident that pertinent written information accompanying the photographs was covered more than adequately in the testimony, and even if it were not it cannot be admitted at this time in this form. It would be improper to admit the balance of the written comments as it is irrelevant and/or inflammatory. This motion will also be denied.

The Court has prepared its own order disposing of this case in accordance with this opinion.